**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **GROSSMONT HOSPITAL CORP.**, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 10-cv-1201 (RLW) |
| **KATHLEEN SEBELIUS**, **Secretary, U.S. Department of Health and Human Services**, | |
| Defendant. | |

<u>**MEMORANDUM OPINION**</u>

Plaintiffs Grossmont Hospital Corporation, Sharp Healthcare, Sharp Chula Vista Medical Center, Sharp Memorial Hospital, and Tri-City Healthcare District (collectively, the "Providers"), five hospitals located in San Diego County, California, bring this action against Kathleen Sebelius in her official capacity as the Secretary of Health and Human Services. The Providers seek judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, of the Secretary's final decision denying their requests for Medicare reimbursements on certain "bad debts" arising from inpatient services provided from May 1, 1994 through June 30, 1998 for patients dually eligible for both Medicare and Medicaid.

This matter is before the Court on cross-motions for summary judgment. The Providers moved for summary judgment, arguing that the Secretary's decision was not based on substantial evidence and was arbitrary and capricious. (*See generally* Dkt. No. 16 ("Pls.' Mem.")). The Secretary opposed the Providers' motion and cross-moved for summary judgment, arguing that the Court should affirm the Secretary's decision because it was based on a reasoned and rational interpretation of the Secretary's own regulations and is supported by the administrative record.

(*See generally* Dkt. No. 18 ("Def.'s Mem.")).  The Court heard oral argument on the motion and the cross-motion on November 5, 2012.

Upon a complete review of the administrative record in this case, and for the following reasons, the Court concludes that the Secretary's decision is the product of reasoned decisionmaking and that the administrative record amply supports the Secretary's decision. Accordingly, the Court will **DENY** the Providers' Motion for Summary Judgment and **GRANT** the Secretary's Motion for Summary Judgment.

## BACKGROUND

**A.    Medicare and Medicaid Statutory and Regulatory Framework**

The Medicare program, established by Title XVIII of the Social Security Act, pays for covered medical care provided primarily to eligible elderly and disabled persons. 42 U.S.C. § 1395, *et seq.*  The Secretary of Health and Human Services is responsible for the program, but she has delegated its administration to the Center for Medicare and Medicaid Services ("CMS").[1] *See* 42 U.S.C. §§ 1395h, 1395u.  The Medicare statute consists of four major components—Parts A through D—but the parties agree that only Part A is relevant to this litigation.  Medicare Part A covers the costs of inpatient hospital care, post-hospital home health services and care in skilled nursing facilities, and hospice care.  *See id.* §§ 1395c, 1395d, 1395x(u); 42 C.F.R. § 409.5.  Hospitals may participate in the Medicare program as providers of services by entering into provider agreements with the Secretary, 42 U.S.C. §§ 1395x(u), 1395cc, and participating hospitals are generally reimbursed under the Medicare statute for their "reasonable costs" of services provided to Medicare beneficiaries.  § 1395x(v)(1)(A).  Under the statute, "reasonable

---

[1]     CMS was formerly known as the Health Care Financing Administration ("HCFA").

cost" is defined as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services," and Congress expressly authorized the Secretary to promulgate regulations "establishing the method or methods to be used, and the items to be included, in determining" reasonable costs. *Id.*

When a participating provider treats a Medicare beneficiary, it generally collects coinsurance and/or deductible payments from the patient and then seeks reimbursement for the remainder of its costs through the Medicare program. The provider obtains reimbursement by filing an annual cost report with its fiscal intermediary, generally a private insurance company that processes payments on behalf of Medicare. After reviewing and auditing those reports, the intermediary issues a Notice of Program Reimbursement ("NPR") to the provider setting forth the amount of allowable Medicare payments. 42 C.F.R. § 405.1803. A provider that is dissatisfied with an NPR decision may appeal to the Provider Reimbursement Review Board ("PRRB" or the "Board"), an administrative tribunal within the Department of Health and Human Services. 42 U.S.C. § 1395oo(a). From there, the Secretary is authorized to review a PRRB determination on her own motion, but she has delegated that authority to the CMS Administrator. *Id.* § 1395oo(f); 42 C.F.R. § 405.1875(a)(1). A provider that is dissatisfied with the final decision of the Secretary, *vis-à-vis* the CMS Administrator, may seek judicial review by initiating a civil action. 42 U.S.C. § 1395oo(f); 42 C.F.R. § 405.1877(b).

Along with Medicare, Title XIX of the Social Security Act, commonly known as the Medicaid statute, establishes a cooperative federal-state program that finances medical care for the poor, regardless of age. *See* 42 U.S.C. §§ 1396-1396v. States that choose to participate in the Medicaid program must submit plans to CMS for approval that detail financial eligibility criteria, covered medical services, and reimbursement methods and standards. *Id.* §§ 1396a(a),

1396b.   Once a State's plan is approved, the State will receive financial assistance from the federal government to administer its Medicaid program according to a percentage formula tied to the State's per-capita income.  *Id.* §§ 1396b, 1396d(b).  In some cases, individuals qualify for both Medicare and Medicaid.  These individuals, commonly known as "dual-eligibles," may be unable to afford the costs of Medicare deductible or coinsurance payments.  As a result, the Medicaid statute allows States to use Medicaid funds to pay the cost-sharing obligations of dual-eligibles, enabling States to shift a large portion, though not all, of the cost of providing health insurance for their elderly poor to the federal treasury.  *See id*. §1396a(a)(10)(E)(i).

**B.     "Bad Debts" Under The Medicare Program**

The Medicare statute prohibits cost-shifting, which means that costs associated with services provided to Medicare beneficiaries cannot be borne by non-Medicare patients, and vice versa.  42 U.S.C. § 1395x(v)(1)(A)(i).  Hence, when a provider is unable to collect coinsurance or deductible payments from a Medicare beneficiary, it can claim those amounts as "bad debts" and treat them as "reasonable costs" subject to reimbursement under the Medicare program, provided that certain conditions are met.  Specifically, to obtain reimbursement for these types of "bad debts," a provider must satisfy four criteria:

   (1) The debt must be related to covered services and derived from deductible and coinsurance amounts.

   (2) The provider must be able to establish that reasonable collection efforts were made.

   (3) The debt was actually uncollectible when claimed as worthless.

   (4) Sound business judgment established that there was no likelihood of recovery at any time in the future.

42 C.F.R. § 413.89(d), (e).[2]

In turn, the Provider Reimbursement Manual ("PRM"), a collection of interpretative rules, provides further guidance as to the applicable circumstances under which "bad debts" can be treated as reimbursable costs. PRM-I section 310 explains that a provider's collection efforts are "reasonable" where they are "similar to the effort the provider puts forth to collect comparable amounts from non-Medicare patients." (Administrative Record ("AR") at 11 (citing PRM-I § 310)). The collection efforts must involve the issuance of a bill. (*Id.*). However, where a provider can establish that a beneficiary is indigent—among other ways, by showing that the beneficiary was Medicaid-eligible at the time of services—a presumption of uncollectibility applies. (AR at 11-12 (citing PRM-I § 312)). In those cases, while the provider's obligation to send a bill to the patient is excused, Section 312 nevertheless requires a provider to "determine that no source other than the patient," including Medicaid, is responsible for the patient's bill. (*Id.*). Section 322 expressly deals with bad debt claims for "dual-eligibles" and provides that, where a State is obligated to pay all or part of the Medicare deductible or coinsurance amounts, including where a State imposes a payment "ceiling," those amounts are not allowable as bad debts. (AR at 11-12 (citing PRM-I § 322)). By contrast, any amounts that the State is <u>not</u> obligated to pay may be included as a bad debt under Medicare only where the requirements of Section 312, and if applicable, Section 310 are met. (*Id.*).

CMS issued Joint Signature Memorandum 370 ("JSM-370") on August 10, 2004, to clarify the Medicare "must bill" policy for reimbursing dual-eligibles' bad debts. (AR at 13-14, 383-384). JSM-370 specifies that "in those instances where the State owes none or only a portion of the dual-eligible patient's deductible or co-pay, the unpaid liability is not reimbursable

---

[2]     This regulation was formerly designated at 42 C.F.R. § 413.80 but was redesignated in 2004 at 42 C.F.R. § 413.89 without substantive change.

to the provider by Medicare until the provider bills the state, and the State refuses payment (with a State Remittance advice)." (*Id.* (citing JSM-370)).  The Secretary issued this memorandum to reiterate the parameters of her "must bill" policy after the language of former PRM-II § 1102.3L was found "unenforceable" by the Ninth Circuit Court of Appeals.  *See Cmty. Hosp. of the Monterey Peninsula v. Thompson*, 323 F.3d 782, 793, 797 (9th Cir. 2003).  More specifically, JSM-370 reemphasized the need for providers to actually bill the State Medicare program on dual-eligibles' claims and obtain a State determination as to its financial responsibility, if any, on those claims.  (AR at 13-14).

**C.    California's Medicaid Program And The Providers' Reimbursement Claims**

California participates in the Medicaid program by operating a State program commonly known as Medi-Cal.  (Def.'s Mem. at 11 (citing CAL. WELF. & INST. CODE § 14000.4)).  Prior to May 1, 1994, the Medi-Cal program paid 100 percent of dual-eligibles' Medicare deductibles and coinsurance costs, such that there were generally no bad debts associated with claims for such patients.  (AR at 16).  On May 1, 1994, however, California stopped paying these cost-sharing amounts altogether without consulting the Secretary, in contravention of its Medicaid State plan.  (*Id.*).  In light of California's new policy to decline payments on dual-eligibles' claims, the Secretary instructed Medicare intermediaries not to reimburse these amounts as Medicare bad debts.  (AR at 255, 258).  Several hospitals filed suit against the State of California, and, in the midst of that litigation, California submitted an amendment to its State Medicaid plan that the Secretary approved on February 28, 1996, applied retroactively to May 1, 1994.  (AR at 255).  Under the new plan, California established a payment "ceiling," whereby it would pay for the deductible and coinsurance costs only if the rate that Medicaid would

otherwise pay for the service exceeded the amount paid by Medicare.  (AR at 16-17, 255).  For claims subject to this payment ceiling, California would perform a claim-by-claim comparison of the Medi-Cal and Medicare payment rates to determine its payment responsibility, if any.  (AR at 255-56, 274).

The Secretary ultimately reached an agreement with the State of California, through which the State agreed to reprocess the previously unpaid claims covering the cost reporting periods from May 1, 1994 through April 4, 1999.  (AR at 18).  Once the State completed this reprocessing, it furnished reports to the intermediaries that showed the claim comparison of amounts paid by Medicare and the Medicaid payment rate for the Medicare coinsurance and deductible amounts.  (*Id.*).  Based on these reports, the unpaid coinsurance and deductible amounts were allowable as "bad debt," and the intermediaries were instructed to issue payments to providers for these amounts retroactive to May 1, 1994. (*Id.*).

The Providers in this case received their two lump-sum payments in August 1999, along with copies of the final reports prepared by the State showing a claim-by-claim comparison of the Medicare payment with the Medi-Cal payment.  (*Id.*).  Upon review of the reports, the Providers believed that they did not encompass all of their inpatient claims during the period covered by the lump sum payments.  The Providers contacted Medi-Cal and requested a correction of the claims data, but the State of California never took action on this request.  (*Id.*).  In response, the Providers opted to calculate on their own the amounts they believed were not included in the lump-sum payments, using information obtained from Medicare and Medi-Cal.  (Pls.' Mem. at 21-24).

**D.      Administrative Proceedings**

The Providers timely appealed the intermediary's determination to the PRRB, providing the Board with their own calculations on the claims at issue.  On January 17, 2008, the PRRB held a hearing on the issue of "[w]hether the Providers have been properly paid for bad debts for Medicare deductible and coinsurance amounts associated with Medicaid-eligible inpatients for services between May 1, 1994 and June 30, 1998."  (AR at 41).  The Board concluded that the Providers had billed Medicare "as supported by Medicare [Provider Statistical & Reimbursement] reports," and that "the inpatient crossover claims data was directly transferred to the state Medicaid agency, Medi-Cal, by the intermediary."  (AR at 48).  As a result, the Board held that the Providers "complied with the Medicare billing requirements" and determined that the intermediary had sufficient information to determine "the amounts which the state is not obligated to pay."  (*Id.*).   In other words, the PRRB deemed the Providers' self-prepared claims reports sufficient to justify reimbursement on the bad debts at issue.

Both the intermediary and CMS sought administrative review of the Board's decision and provided comments requesting reversal, but the Providers did not comment.  (AR at 2-23, 24-31, 34-35).  On May 17, 2010, the CMS Administrator reversed the Board's decision.  In so doing, the Administrator stated that, under PRM § 322, only the amount that the State "does not pay can be reimbursed as bad debt," finding that "[t]his language plainly requires that the provider bill the State as a prerequisite of payment of the claim by Medicare as a bad debt and that the State make a determination on that claim."  (AR at 15).  In turn, the Administrator stated that "it is unacceptable for a provider to write-off a Medicare bad debt as worthless without ensuring that the State has been billed (whether through the automated crossover claim or direct billing) and having received a determination from the State as to the amount of its financial obligation."  (AR at 16).  Although the Providers maintained that all of the claims at issue had been billed to

the State—automatically through a "crossover" system—the Administrator found that the evidence in the record showed otherwise.  While clear to state that this conclusion was "not determinative of this case," the Administrator stated that "the record thus supports a conclusion that these claims were not in the State's system, that is, they were not billed whether through the automated crossover claims billing or direct billing."  (AR at 21).  Ultimately, the Administrator concluded that the case "turns on the undisputed fact that there are no determinations by the State on these claims."  (*Id.*).  Therefore, the Administrator held, "until such time as the Providers receive a determination from the State on these claims, the claims cannot be allowed as Medicare bad debts."  (AR at 22).

The Providers initiated this lawsuit on July 15, 2010, arguing that the Secretary's final decision denying their reimbursement claims was both unsupported by substantial evidence and was arbitrary and capricious under the APA.

## ANALYSIS

### A.  Standard of Review

Under the Medicare Act, judicial review of the Secretary's reimbursement decisions is governed by the APA.  *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (citing 42 U.S.C. § 1395oo(f)(1)); *Tenet HealthSystems HealthCorp. v. Thompson*, 254 F.3d 238, 243-44 (D.C. Cir. 2001).  The Secretary's decision may only be set aside if it is "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or unsupported by substantial evidence in the administrative record."  *Marymount Hosp., Inc. v. Shalala*, 19 F.3d 658, 661 (D.C. Cir. 1994) (quoting 5 U.S.C. § 706(2)(A), (E)).  Under both the "arbitrary and capricious" and "substantial evidence" standards, the scope of review is narrow, and a court must not

substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983); G*en. Teamsters Local Union No. 174 v. Nat'l Labor Relations Bd.*, 723 F.2d 966, 971 (D.C. Cir. 1983). As long as an agency has "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made,'" the reviewing court will not disturb the agency's action. *MD Pharm., Inc. v. Drug Enforcement Admin.*, 133 F.3d 8, 16 (D.C. Cir. 1998) (quoting *State Farm*, 463 U.S. at 43); *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006). The burden of establishing that the Secretary's action in this case violates the APA standards lies with the Providers. *Diplomat Lakewood, Inc. v. Harris*, 613 F.2d 1009, 1018 (D.C. Cir. 1979).

Where the Secretary is interpreting her own regulations, her interpretation is entitled to "substantial deference" and "must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ.*, 512 U.S. at 512. Indeed, "broad deference is all the more warranted when, as [with Medicare], the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" *Id.* (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991)); *St. Luke's Hosp. v. Sebelius*, 611 F.3d 900, 904-05 (D.C. Cir. 2010). In sum, courts must "defer to the Secretary's interpretation unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.'" *Thomas Jefferson Univ.*, 512 U.S. at 512 (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)).

### B.  The Parties' Arguments

Through this case, the Providers mount a number of challenges to the Secretary's decision denying their reimbursement claims.  First, the Providers contend that, by interpreting the "must bill" policy as requiring a State determination on the bad debt claims at issue, the Secretary violated Congress' "Bad Debt Moratorium," which generally prohibits the application of debt reimbursement policies that were not in existence prior to 1987.  (Pls.' Mem. at 31-34).  Second, the Providers argue that the Secretary's application of the "must bill" policy in this case was arbitrary and capricious in any event, because all of the claims were billed to the State through an automated "crossover" system and because the State of California made the "substantive determination" necessary to calculate its payments obligations on the claims at issue.  (*Id.* at 35-38).  Third, the Providers attack the Secretary's justification for denying their claims as "inconsistent" with her own practices, claiming that the Secretary accepted information other than remittance advices in issuing the two "lump sum" payments and should have done so with respect to these additional claims.  (*Id.* at 38-39).  Fourth, the Providers complain that the corrections process for potential underpayments during the lump sum process was "illusory," arguing that the Secretary's decision must be set aside as a result.  (*Id.* at 39-42).  Fifth, the Providers challenge the Secretary's decision not to apply the "hold harmless" provisions of JSM-370.  (*Id.* at 42-43).  And, finally, the Providers contend that the Secretary's decision violates the statutory prohibition against Medicare cost-shifting.  (*Id.* at 43-44).

For her part, the Secretary counters that her application of the "must bill" policy was entirely proper and based on a lawful, longstanding interpretation of agency regulations.  (Def.'s Mem. at 24-29).  Specifically, the Secretary contends that she properly found that the Providers both: (1) failed to bill the State Medicaid programs for the claims at issue before seeking

reimbursement and (2) failed to obtain any State determinations of payment responsibility on those claims.  (*Id.* at 29-34).   The Secretary also asserts that she properly found the "hold harmless" provisions of JSM-370 inapplicable to the Providers in this case.  (*Id.* at 35-39). Finally, she maintains that her denial of the Providers' reimbursement claims does not violate the statutory prohibition on cost-shifting.  (*Id.* at 39-40).  If anything, the Secretary concludes, the Providers' remedy lies not against Medicare, but against the Medi-Cal program, given that the Providers never pursued any administrative or judicial remedy against the State for failing to issue determinations of its payment responsibility on these claims.  (*Id.* at 40-42).

### C.  The "Bad Debt Moratorium"

As an initial matter, the Providers argue that the Secretary's "must bill" policy—which served as the basis for the Secretary's denial of the claims at issue, and which lies at the heart of this dispute—is invalid on its face because it violates Congress' "Bad Debt Moratorium." However, Plaintiffs failed to raise this argument whatsoever during the administrative proceedings below—either before the Board or through comments to the CMS Administrator[3]— and the Administrator did not render any determination as to the moratorium's impact on the Secretary's "must bill" policy.  (AR at 2-23, 40-50, 91-155, 335-351).  Consequently, the Court will not consider this argument now, given that "[a] party must first raise an issue with an agency before seeking judicial review."  *ExxonMobil Oil Corp. v. FERC*, 487 F.3d 945, 962 (D.C. Cir. 2007); *Nuclear Energy Inst. v. EPA*, 373 F.3d 1251, 1297 (D.C. Cir. 2004) ("It is a hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review."); *Loma Linda Univ. Med. Ctr. v.*

---

[3]    In fact, the record reveals that the Providers declined to submit <u>any</u> comments after being notified of the Administrator's intention to review the Board's decision.  (AR at 2-23).

*Sebelius*, 684 F. Supp. 2d 42, 56 n.13 (D.D.C. 2010) (refusing to consider new arguments not raised before the Board or CMS Administrator).[4]  Nor will the Court consider Amicus' arguments, which relate exclusively to the issue of whether the Secretary violated the moratorium.  (*See* Dkt. No. 31, Amicus Brief).

### D.  The Secretary's "Must-Bill" Policy

The Providers also argue that, regardless of whether the "must bill" policy is valid *vis-à-vis* the moratorium, the Secretary's interpretation of that policy is improper and should not be endorsed by this Court.  In so arguing, the Providers characterize this as a case that turns on two distinct policies: (1) the "must bill" policy, a standalone policy that requires providers to bill the State for dual-eligible-related claims; and (2) the "mandatory State determination" policy, a separate policy that requires providers to obtain a State determination on those billed claims. Insofar as the Secretary's denial of their claims was based on the absence of State determinations, the Providers argue that the decision cannot stand because the "mandatory State determination" policy conflicts with the Secretary's own regulations and prior policy interpretations governing the recovery of bad debts as "reasonable costs."  The Secretary disagrees and insists that the "must bill" policy, since its inception, has been applied as a single

---

[4]  Along with safeguarding "simple fairness," insisting that an issue be raised during administrative proceedings provides "this Court with a record to evaluate complex regulatory issues; after all, the scope of judicial review under the APA would be significantly expanded if courts were to adjudicate administrative action without the benefit of a full airing of the issues before the agency."  *ExxonMobil Oil Corp.*, 487 F.3d at 962 (citing *Advocates for Hwy. & Auto. Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1150 (D.C. Cir. 2005)).  Unlike in the instant matter, those cases that have addressed the bad debt moratorium had the benefit of considering the issue with a fully-developed administrative record because that argument had been presented to the Board and to the CMS Administrator.  *Cf. Foothill Hosp. v. Leavitt*, 558 F. Supp. 2d 1 (D.D.C. 2008); *Detroit Receiving Hosp. & Univ. Health Ctr. v. Shalala*, 1999 U.S. LEXIS 26428 (6th Cir. Oct. 15, 2009); *Dameron Hosp. Ass'n v. Leavitt*, 2007 U.S. Dist. LEXIS 57796 (E.D. Cal. Aug. 8, 2007).

policy encompassing both requirements—not only have providers been required to bill the State Medicaid program for the claims, but they have also been required to obtain the State's determination as to its financial responsibility on those claims.

Under the Medicare statute, Congress expressly vested the Secretary with authority to "prescrib[e] regulations" establishing the "method or methods to be used, and the items to be included," in determining the "reasonable costs" of Medicare services that can be reimbursed to providers.  42 U.S.C. § 1395v(1)(A).  Congress also granted the Secretary substantial discretion to determine the type of information required as a condition of reimbursement under the Medicare program.  *Id.* § 1395g(a).  Given that Congress "explicitly left a gap for [the Secretary] to fill," the Secretary's regulations on these issues "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."  *Buongiorno v. Sullivan*, 912 F.2d 504, 508 (D.C. Cir. 1990) (quoting *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 833-34 (1984)).

In keeping with this delegated authority, the Secretary promulgated regulations establishing when a provider's bad debts qualify as "reasonable costs" eligible for reimbursement under the Medicare program.  Under those regulations, providers must meet several requirements to render bad debts eligible as reimbursable amounts:

    (1) The debt must be related to covered services and derived from deductible and coinsurance amounts.

    (2) The provider must be able to establish that reasonable collection efforts were made.

    (3) The debt was actually uncollectible when claimed as worthless.

    (4) Sound business judgment established there was no likelihood of recovery at any time in the future.

42 C.F.R. § 413.89(d).  In addition, the Secretary, through her delegated authority to CMS,

issued further interpretive guidance as to those criteria through the PRM.  Section 310 elaborates on the "reasonable collection efforts" requirement of Section 413.89(e)(2), stating that "a provider's effort to collect Medicare deductible and coinsurance amounts . . . <u>must involve the issuance of a bill</u> . . . to the party responsible for the patient's personal financial obligations." (AR at 10-11 (citing PRM-I § 310) (emphasis added)).  But when a provider can establish that beneficiaries are indigent—including "when such individuals have also been determined eligible for Medicaid"—a presumption of uncollectibility applies.  (*Id.* at 11 (citing PRM-I § 312)).  In those cases, while the provider's obligation to send a bill <u>to the beneficiary</u> is excused, Section 312 nevertheless requires a provider to "determine that no source other than the patient," including Medicaid, is responsible for the patient's bill.  (*Id.* (directing the reader to "§ 322 for bad debts under State Welfare Programs")).

Section 322 of the PRM, in turn, provides:

> Where the State is obligated either by statute or under the terms of its [Medicaid] plan to pay all, or any part, of the Medicare deductible or coinsurance amounts, those amounts are not allowable as bad debts under Medicare.  <u>Any portion of such deductible or coinsurance amounts that the State is not obligated to pay</u> can be included as a bad debt under Medicare provided that the requirements of § 312 or, if applicable, § 310 are met.

(*Id.* at 11 (citing PRM-I § 322) (emphasis added)).  This section also addresses circumstances in which a State payment "ceiling" exists:

> In some instances the State has an obligation to pay, but either does not pay anything or pays only part of the deductible, or coinsurance because of a State payment "ceiling."  For example assume that a State pays a maximum of $42.50 per day . . . and the provider's cost is $60.00 a day.  The coinsurance is $32.50 a day so that Medicare pays $27.50 ($60.00 less $32.50).  In this case, the State limits its payment towards the coinsurance to $15.00 ($42.50 less $27.50).  In these situations, <u>any portion of the deductible or coinsurance that the State does not pay</u> that remains unpaid by the patient, can be included as a bad debt under Medicare, provided that the requirements of § 312 are met.

(*Id.* (emphasis added)).

Interpreting the language of Section 413.89(e), the Secretary, speaking through the CMS Administrator, concluded that "a fundamental requirement to demonstrate that an amount is, in fact, unpaid and uncollectible, is to bill the responsible party." (*Id.* at 15). The Secretary also explained that PRM § 322's reference to the amount "that the State does not pay . . . plainly requires that the provider bill the State as a prerequisite of payment of the claims by Medicare as a bad debt and that the State make a determination on the claim." (*Id.*). The Secretary therefore reasoned that "it is unacceptable for a provider to write-off a Medicare bad debt as worthless without ensuring that the State has been billed . . . and having received a determination from the State as to the amount of its financial obligation." (*Id.* at 16).

The Secretary also relied on the language of Joint Signature Memorandum 370, issued in August 2004, through which CMS reiterated the Secretary's interpretation that "reasonable" collection efforts consist of providers billing the State Medicaid program and obtaining a determination on those claims from the State:

> In order to fulfill the requirement that a provider make a "reasonable" collection effort with respect to the deductibles and co-insurance amounts owed by dual-eligible patients, our bad debt policy requires the provider to bill the patient or entity legally responsible for the patients' bill before the provider can be reimbursed for uncollectible amounts . . . . [I]n those instances where the state owes none or only a portion of the dual-eligible patient's deductible or co-pay, the unpaid liability for the bad debt is not reimbursable to the provider by Medicare until the provider bills the State, and the State refuses payment (with a State Remittance Advice).

(*Id.* at 383-384 (emphasis added)).

Our Circuit has made clear that, when reviewing "the Secretary's interpretation of her own regulations," such as the PRM instructions detailed above, courts must apply an even "more deferential standard than that afforded under *Chevron*." *Nat'l Medical Enters. v. Shalala*, 43 F.3d 691, 696-97 (D.C. Cir. 1995) (construing appropriate deference in reviewing PRM provisions); *Cmty. Care Found. v. Thompson*, 412 F. Supp. 2d 18, 22-23 (D.D.C. 2006) ("The

high degree of deference due to the Secretary's interpretation of Medicare regulations extends to the PRM provisions, which are themselves interpretations of regulations."). The Court must "defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." *Thomas Jefferson Univ.*, 512 U.S. at 512. Given the significant deference owed to the Secretary's interpretation of the bad debt regulations, the Court concludes that her position is not "plainly erroneous or inconsistent with the regulation[s]." *Id.*; *Marymount Hosp.*, 19 F.3d at 661.

The parties all agree that the "must bill" policy is an essential component of the Medicare reimbursement structure because the State has the most current information regarding a beneficiary's Medicaid status at the time of treatment, which, in turn, enables the State to make the most accurate determination of its own cost-sharing liability. (Pls.' Mem. at 8; Def.'s Mem. at 27). Because individual States "administer their [Medicaid] programs differently and maintain billing and documentation requirements unique to each State program," (AR at 22), it is all the more important for the States themselves to determine a beneficiary's Medicaid status. In addition, as the Secretary rightly points out, "submission of the claim to the State and preservation of the remittance advice is an essential and required record keeping criteria for Medicare reimbursement." (*Id.* at 16 n.15 (citing 42 C.F.R. § 413.20)). Furthermore, the Court agrees that a uniform policy concerning bad debt billing and documentation requirements is critical to the administration of the Medicare program. All fifty States and the District of Columbia operate separate, unique Medicaid programs. Thus, the Secretary reasonably believes that permitting individual States to rely on their own protocols for bad debt reimbursement—

whether with respect to billing or supporting documentation—could wreak administrative havoc on the Medicare system.

The Court also notes that several other courts, including the Ninth Circuit Court of Appeals and a number of judges in this District, have upheld the Secretary's "must bill" policy. *See Monterey Peninsula*, 323 F.3d at 793, 797 (finding the "must-bill policy to be a reasonable interpretation of the reimbursement system and not inconsistent with the status and regulations"); *Cove Assocs. Joint Venture v. Sebelius*, 848 F. Supp. 2d 13, 26 (D.D.C. 2012) (Rothstein, J.) ("[T]he must-bill policy is consistent with the Medicare statute and regulations, and is not an unreasonable implementation of either."); *GCI Health Care Ctrs. v. Thompson*, 209 F. Supp. 2d 63, 72 (D.D.C. 2002) (Kollar-Kotelly, J.).

### E.  The Secretary's Application Of The "Must-Bill" Policy To The Providers' Claims

#### 1.  The Providers' Obligation To Obtain State Determinations

Having found the "must bill" policy valid as a general matter, including the Secretary's requirement that providers obtain a State determination on dual-eligible-related claims, the Court turns to the Providers' argument that the Secretary's application of that policy in this case was unsupported by substantial evidence and/or arbitrary and capricious.

The Providers principally challenge the Secretary's finding that "there are no determinations by the State on [their] claims," along with her conclusion that "until such time as the Providers receive a determination from the State on these claims, the claims cannot be allowed as Medicare bad debts." (AR at 21-22).  They contend that the Secretary denied their claims based on the "wooden application of a ministerial requirement."  (Pls.' Mem. at 29, 31). In their view, the Secretary's denial of their claims based on the "State determination" requirement is particularly arbitrary and inappropriate in this case because they followed the

exact same procedure that the Secretary accepted when issuing the underlying lump-sum payments that they believe should have encompassed these claims in the first place.  (*Id.* at 35-39).  In addition, the Providers contend that they did obtain a "State determination" on these claims in any event because the State of California made "the only substantive determination necessary to establish its obligation for the claims at issue."  (*Id.* at 38).

For the 1999 lump-sum payments covering the broader universe of claims, the Providers are correct that the Secretary issued reimbursements without requiring formal remittance advices from the State.  Instead, after the State reprocessed the applicable range of claims, the State prepared reports that listed, on a claim-by-claim basis: (a) the amounts previously paid by Medicare for each claim; (b) the applicable Medi-Cal rate for each claim; and (c) any resultant Medi-Cal payment responsibility for each claim.  (AR at 18).  Based on these reports, which were calculated and prepared by the State Medi-Cal program, the Secretary allowed the resulting unpaid deductible and coinsurance amounts to be reimbursed as Medicare bad debt.  (*Id.*).  The Providers insist that they submitted the same sort of reports to the Secretary when they sought reimbursement for the claims at issue here.  After confirming the patients' Medicaid eligibility using information obtained directly from the State,[5] the Providers attest that they went through the same type of "formulaic" calculations that were previously done by the State: (a) identifying

---

[5]     According to the Providers, they identified patients' Medi-Cal eligibility using spreadsheets provided by the State of California to help hospitals calculate their "Disproportionate Share Hospital" ("DSH") payments.  By statute, hospitals that treat a disproportionately large number of low-income patients are eligible for a DSH payment in addition to their standard Medicare payments.  42 U.S.C. § 1395ww(d)(5)(F).  These DSH payments are based on the number of "Medicaid-eligible days" during the fiscal year at issue, and providers and intermediaries calculate those numbers using Medicaid eligibility information received from the State.  (Pls.' Mem. at 21-23).  Insofar as the Secretary does not dispute the Providers' position or the reliability of this information, the Court presumes the accuracy of the data for purposes of this decision.  Nevertheless, as explained herein, this fact still does not render the Secretary's decision below improper.

the amounts already paid by Medicare for each claim; (b) applying a fixed, *per diem* Medi-Cal

rate for each claim; and (c) calculating the amounts that would remain unpaid by Medi-Cal on

each claim. (Pls.' Mem. at 36-37).

The Providers seem to ignore the critical fact that distinguishes their subsequent

reimbursement requests from those previously accepted by the Secretary—the reports were

prepared by the Providers themselves, and <u>not by the State of California</u>. The Providers concede

as much: "Because Medi-Cal would not provide a determination of its payment liability, the

Hospitals identified that liability in accordance with the Secretary's lump-sum payment

methodology using eligibility and payment information from Medi-Cal and Medicare." (Dkt.

No. 21 ("Pls.' Reply") at 11). By contrast, the prior reports were prepared by the State Medi-Cal

program and were therefore accepted by the Secretary as the requisite "State determinations":

> <u>The State processed claims</u> for the dates May 1, 1994 through April 4, 1999, <u>and determined its cost sharing obligations</u>. The State Medi-Cal program furnished reports to the Intermediary that showed the claim comparison of the amount paid by Medicare and the Medicaid payment rate for inpatient dual eligible claims . . . . <u>Having received a State determination on the claims listed</u>, the related unpaid coinsurance and deductible amounts were considered allowed Medicare bad debts by CMS.

(AR at 18 (emphasis added)).[6]  According to the Secretary, "only a State determination of its

payment responsibility can establish that a debt is uncollectible," which means that "a provider

may not substitute its own estimates of the likely amount of Medicare reimbursement in place of

the required State determinations of payment responsibility." (Def.'s Mem. at 32). The Court

does not find that this interpretation was applied inconsistently as between the underlying lump-

sum payments and the reimbursement requests at issue in this case, as the Providers argue; the

---

[6]     Indeed, the Secretary expressly stated that "[d]espite suggestions otherwise, the Medicare bad debt lump payment was consistent with the 'must bill' policy as it was based on claims (bills) submitted to the Medicaid agency (whether by direct billing or crossover claims) upon which the State made determinations of its obligation prior to Medicare allowing the bad debt." (AR at 19 n.19).

Secretary found that the former requests were accompanied by State determinations, while she determined that the latter were not.[7]  (AR at 21-22).

In spite of this, the Providers argue that their reports <u>should</u> be characterized as "State determinations" because, while the Providers might have performed the "formulaic" calculations in the reports themselves, they insist that the State of California made the only "substantive" determination necessary—*i.e.*, determining the patients' Medi-Cal eligibility status at the time of payment.  (Pls.' Mem. at 35-38).  Once the patients' underlying substantive liability is determined by the State, the Providers assert, Medi-Cal is in no better position to calculate their financial obligation because those calculations are simply "formulaic" and based on pre-determined, fixed amounts.  (*Id.* at 30).  The Secretary takes a different position and maintains that the "must bill" policy does not simply require a State determination of an <u>individual's Medicaid eligibility</u>; it requires a State determination as to its <u>financial responsibility</u>, of which Medicaid eligibility is simply one component.  (Def.'s Mem. at 34).  The Secretary asserts that this policy is not simply a matter of "bureaucratic inflexibility" designed to "inconvenience providers."  (Dkt. No. 24 ("Def.'s Reply") at 12).  She explains that, in her view:

> [I]t is wisest, to protect the fiscal integrity of the [Medicare program] . . ., to rely upon the State governments to accurately determine their payment responsibility for dual eligibles' cost-sharing amounts, rather than to entrust these important calculations to innumerable individual providers operating under a multitude of State plans, each with distinct payment methodologies.

(*Id.* at 12-13).  On balance, while the Court does not necessarily disagree with the Providers that, in some circumstances, their alternative methodology could be equally as effective and accurate as the process endorsed by the Secretary, the Court is unable to conclude that the Secretary's

---

[7]      Put differently, and as the Secretary explains in her brief, "[s]ince [the Providers] allege that the lump-sum payments did not include the claims at issue, and since the lump-sum payments included all claims for which the State had made determinations of its payment responsibility, there were no State determinations produced for the claims at issue."  (Def.'s Mem. at 19).

interpretation is "plainly erroneous or inconsistent with [her] regulation[s]." *Thomas Jefferson Univ.*, 512 U.S. at 512; *Psychiatric Inst. of Wash., D.C., Inc. v. Schweiker*, 669 F.2d 812, 813-14 (D.C. Cir. 1981) ("[W]here the decision under review involves an agency's interpretation of its own regulations, forming part of a complex statutory scheme which the agency is charged with administering, the arguments for deference to administrative expertise are at their strongest.").

Finally, the Court notes that, although the Providers contend that the case of *Summer Hill Nursing Home LLC v. Johnson*, 603 F. Supp. 2d 35 (D.D.C. 2009) (Collyer, J.), supports their position, their reliance on that decision is misplaced. There, the court remanded to the Secretary because, although the providers had not billed the State of New Jersey and obtained remittance advices <u>prior to</u> submitting reimbursement requests to their intermediary, they <u>subsequently</u> billed the State and obtained remittance advices on the claims before filing their appeal with the PRRB. *Id.* at 36-39. Insofar as the Secretary failed to explain how these subsequent remittance advices ran afoul of the "must bill" policy, the Court concluded that the Secretary's decision was arbitrary and capricious. *Id.* at 39. Of course, *Summer Hill* is a far cry from this case because the Providers here never obtained any State determinations, let alone formal remittance advices, on these particular claims.

Accordingly, the Court finds that the evidence in the administrative record amply supports the Secretary's conclusion that the Providers did not receive any State determinations on the claims at issue, and the Court will not disturb that result. In addition, the Secretary's determination was the product of reasoned decisionmaking, consisting of a "rational connection

between the facts found and the choice made."  *State Farm*, 463 U.S. at 43; *GCI Health Care Ctrs.*, 209 F. Supp. 2d at 74.  Therefore, the Secretary's finding was not arbitrary or capricious.[8]


### 2.   The Providers' Obligation To Bill The State Medicaid Program

The Secretary also asks the Court to uphold her decision on the separate and "independent" ground that not all of the claims at issue were necessarily billed to the State Medi-Cal program in the first place.  (Def.'s Mem. at 29-31; Def.'s Reply at 8-9).  The Providers argue otherwise, citing to the following language from the Secretary's decision and claiming that no such finding served as the basis for the agency's denial of their claims at the administrative level:

> <u>While not determinative of this case</u>, the record thus supports a conclusion that these claims were not in the State's system, that is, they were not billed whether through the automated crossover claims billing or direct billing and, therefore, as they were not in the State system they were not part of the claims reprocessed by the State in the listing.

(Pls.' Reply at 10 n.8 (quoting AR at 21) (emphasis added)).  They go on to "presum[e]," in

---

[8]      The Court is also unpersuaded by the Providers' argument that the dispute process developed by the Secretary in connection with the 1999 lump-sum payments was "illusory."  The Providers assert that they find themselves in the proverbial "Catch-22" because, on the one hand, the State declined to "rerun" the claims and issue determinations, while, on the other hand, the Secretary will not issue reimbursements until the Providers can present State determinations on the claims.  (Pls.' Mem. at 39-41).  While the Court is certainly sympathetic to the Providers' predicament, the Court is not convinced that the process is "illusory."   While the record establishes that the Providers initially asked the Medi-Cal program to "rerun" the original claims reports in the immediate timeframe after receiving the lump-sum payments in 1999, it appears that the Providers then waited years before pursuing any further resolution efforts with the State. (Dkt. Nos. 21-2, 21-3).  Further, as the Secretary points out, it does not appear that the Providers ever pursued any administrative or judicial action against the State of California for refusing to discharge its responsibility under its State Medicaid program by processing the claims at issue. The Court also notes that the Providers completely fail to mention whether the State ever reimbursed the portions of these claims for which the Medi-Cal program was responsible and, if not, whether the Providers have pursued any legal action against the State of California to obtain those payments.   Were the Providers to do so, they could credibly contend that the State's resultant payments serve as the State determinations that the Secretary requires to treat the remaining amounts as Medicare bad debts.

conclusory fashion, that that Secretary characterized this finding as "not determinative" because "the [administrative record] shows the claims were, in fact, billed to Medi-Cal even though Medi-Cal apparently did not process them." (*Id.*). The Court does not agree with this leap of logic, considering that the Secretary expressly found otherwise, both in the plain text of the cited passage above and later in her decision:

> Moreover, while not determinative of this case, the Providers were aware that some claims were not crossing over and were not showing up on the Medicaid remittance advices and required direct billing of the State. The Providers decided not to take such action to direct bill in all such cases.

(AR at 22).

Under the APA, the Court should accept an agency's factual findings "if those findings are supported by substantial evidence on the record as a whole." *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992); *Allied Mech. Servs. v. NLRB*, 668 F.3d 758 (D.C. Cir. 2012). This standard is "something less than the weight of the evidence," which means that "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *GCI Health Care Ctrs.*, 209 F. Supp. at 73-74 (quoting *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 619-20 (1966)). Applying this standard, the Court finds that, as a factual matter, the administrative record when viewed as a whole could support the Secretary's finding that the Providers were unable to establish that all of the claims at issue were actually billed to the State of California. As a legal matter, however, the Court is simply unable to attribute the legal significance to this factual finding that the Secretary now seeks. It is well settled that "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943); *America's Cmty. Bankers v. FDIC*, 200 F.3d 822, 835 (D.C. Cir. 2000) ("Courts are not commissioned to remake administrative determinations on

different bases than those considered and relied upon by the administrative agencies charged with the making of those decisions."). Thus, in view of the Secretary's explicit caveat—not just once, but twice—that this finding was "not determinative" of her decision, the Court declines to affirm the Secretary's decision on this alternative ground.

### F.  Former PRM-II Section 1102.3L And The "Hold Harmless Provision" Of JSM-370

The Providers also argue that the Secretary's decision should be reversed based on the alternative reimbursement approach ostensibly endorsed by the language of former PRM-II § 1102.3L.  Former Section 1102.3L—a manual provision that the Secretary has since revised— provided that "it may not be necessary for a provider to actually bill the Medicaid program to establish a Medicare crossover bad debt where the provider can establish that Medicaid is not responsible for payment."  (AR at 478-480).  Instead, providers were required to furnish documentation of "Medicaid eligibility at the time services were rendered (via valid Medicaid eligibility number)," and establish that "[n]onpayment that would have occurred if the crossover claim had actually been filed with Medicaid."  (*Id.*).  The Providers assert that the reports they submitted with their claims properly satisfied these requirements.

The Secretary responds that, insofar as former PRM-II § 1102.3L conflicts with the "must bill" policy and its reimbursement requirements, the now-defunct provision "cannot be enforced."  (Dkt. No. 24 at 13).  The Secretary cites the Ninth Circuit's decision in *Monterey Peninsula*, which stated that "[b]ecause a regulation has the force of law, an interpretation of a regulation in Part II of the PRM that is inconsistent with the regulation should not be enforced." 323 F.3d at 798-99; *see also Cove Assocs. Joint Venture*, 848 F. Supp. 2d at 28 (reiterating the Ninth Circuit's conclusion that former PRM-II § 1102.3L "conflicted with the must-bill policy and was not enforceable").  The Court agrees with this analysis.  There can be no dispute that the

Secretary revoked the above language in 2004 through JSM-370, through which the Secretary reiterated the requirements of the "must bill" policy.  Thus, to the extent that former PRM-II § 1102.3L would now permit the Providers to obtain bad debt reimbursements without having to bill the State and secure State determinations on these claims—as the Providers necessarily argue—its language conflicts with the Secretary's longstanding interpretation of the "must bill" policy and cannot be enforced.[9]   Therefore, the Secretary's denial of the Providers' claims was not arbitrary or capricious in this respect.

Potentially recognizing that former PRM-II § 1102.3L cannot apply, the Providers also assert that the Secretary should have reimbursed their claims pursuant to the "hold harmless" provisions that were included in JSM-370 for those providers who validly relied on the now-defunct language of Section 1102.3L. Specifically, the "hold harmless" provision provided:

> Intermediaries who followed the now-obsolete Section 1102.3L instructions for cost-reporting periods prior to January 1, 2004 may reimburse providers they service for dual-eligible bad debts with respect to unsettled cost reports that were deemed allowable using other documentation in lieu of billing the state.

---

[9]      The resulting conflict is all the more evident to the Court in view of the Secretary's repeated application of the "must bill" policy in several adjudicative decisions, many of which predate the implementation of the now-defunct language of former PRM-II § 1102.3L.  *See California Hosps. Crossover Bad Debts Group Appeal*, PRRB Dec. No. 2000-D80 (Oct. 31, 2000) ("Reading the sections together, the Administrator concludes that, in situations where a State is liable for all or a portion of the deductible and coinsurance amounts, the State is the responsible party and is to be billed in order to establish the amount of bad debts owed under Medicare."); *Hosp. de Area de Carolina v. Cooperative de Seguros de Vida de Puerto Rico*, Admin. Dec. No. 93-D23 (Apr. 26, 1993) (finding amounts not reimbursable as Medicare bad debts for 1985 and 1986 cost years where "[p]rovider failed to request payment from the Commonwealth for deductibles and coinsurance amounts attributable to Medicare/Medicaid patients for which the Commonwealth was obligated to pay"); *St. Joseph Hosp. v. Blue Cross & Blue Shield Ass'n*, PRRB Dec. No. 84-D109 (Apr. 16, 1984) (deeming collection efforts inadequate for 1984 cost year because "provider did not attempt to bill the State of Georgia for its Medicaid patients"); *Concourse Nursing Home v. Travelers Ins. Co.*, PRRB Dec. No. 83-D152 (Sept. 27, 1983) (concluding that, for 1977 and 1978 cost years, the provider "furnished no documentation which would support its contentions . . . that actual collection efforts were made to obtain payments from . . . the Medicaid authorities before an account balance was considered an uncollectible bad debt for Medicare purposes").

> Intermediaries that required the provider to file a State Remittance Advice for cost reporting periods prior to January 1, 2004, may NOT reopen providers' cost reports to accept alternative documentation for such cost reporting periods.

(AR at 14, 383-84 (emphasis added)).  Significantly, the "hold harmless" provision only applies to providers whose intermediaries permitted alternative documentation in lieu of State determinations; conversely, for providers whose intermediaries chose not to allow alternative documentation and still required some State determination, the "hold harmless provision" cannot be invoked.  (Id.).  Here, the Secretary declined to apply the "hold harmless" provision to these claims, stating that "[t]he Providers also do not meet the hold harmless provisions of JSM-370." (AR at 22).  The Secretary now explains that, by its very terms, JSM-370 cannot apply because the testimony of the Providers' own witness during the Board hearing confirmed that the Providers' intermediary never permitted the use of the alternative documentation contemplated by former § 1102.3L.  (Def.'s Mem. at 38 (citing AR at 125, 129, 133)).  The Court finds that the Secretary's conclusion below on this point, while somewhat scant of reasoning,[10] is supported by evidence in the administrative record, particularly given the Providers' failure to even address this argument in their reply briefing.[11]  (See generally Pls.' Reply).  Therefore, the Court

---

[10]    Concededly, the Court is somewhat troubled by the minimal explanation for this conclusion within the Secretary's decision itself.  Nevertheless, the Court is also mindful that an agency that provides further explanation of its decision during the course of litigation is not always engaging in impermissible post hoc rationalization.  Nat'l Oilseed Processors Ass'n v. Browner, 924 F. Supp. 1193, 1204 (D.D.C. 1996), aff'd in part and remanded sub nom. Troy Corp. v. Browner, 120 F.3d 277 (D.C. Cir. 1997).  The general rule that an agency must defend its actions on the basis on which they were originally taken does not preclude the Court from considering "a more detailed explanation" that does not present a new basis for the agency's action.  Id.; see also Methodist Hosp. of Sacramento v. Shalala, 38 F.3d 1225, 1233 n.11 (D.C. Cir. 1994) (rejecting plaintiffs' argument that the position taken by the agency in litigation was a post hoc rationalization, even though the agency "could have placed a finer point" on the issue in its explanation in the record).  The Court finds that the Secretary's explanation for declining to apply the "hold harmless" provision falls more squarely in the "more detailed explanation" camp than the "post-hoc rationalization" camp.

[11]    Indeed, the Court could elect to treat this argument as conceded simply based on the Providers' failure to respond.  Newton v. Office of the Architect of the Capitol, 840 F. Supp. 2d

concludes that the Secretary's decision not to apply the "hold harmless" provision was rational and sufficiently supported by the administrative record.

### G. Cost-Shifting

Finally, the Providers argue that the Secretary's decision should be overruled because it violates the cost-shifting prohibitions under the Medicare program, 42 U.S.C. § 1395x(v)(1)(A), by impermissibly shifting Medicare costs from Medicare to non-Medicare patients. (Pls.' Reply at 9). In making this argument, however, the Providers fail to grasp the fundamental tenet of the cost-shifting prohibition—it only applies if the costs at issue are, in fact, "reimbursable" under the statute and applicable regulations. *See North Clackamas Cmty. Hosp. v. Harris*, 664 F.2d 701, 707 (9th Cir. 1980) ("[T]he [cost-shifting] statute merely provides that <u>reimbursable</u> costs shall not be shifted to non-Medicare patients, <u>a proposition analytically distinct from the view that all costs of providing care to Medicare patients should be reimbursed</u>.") (emphasis added); *Lexington Cty. Hosp. v. Schweiker*, 740 F.2d 287, 289 (4th Cir. 1984) ("[I]f the prohibition against cost-shifting were not so limited, no cost could ever be disallowed."); *Bond Hospitals, Inc. v. Heckler*, 587 F. Supp. 1268, 1272-73 (D.D.C. 1984) ("Since the Secretary reasonably determined that interest on income taxes is not a reimbursable cost, her decision does not contravene the prohibition against cost-shifting."). Accordingly, given the Court's affirmance of the Secretary's decision that these claims were not reimburseable costs, the statutory prohibition on cost-shifting is not implicated in this case.

---

384, 397 (D.D.C. 2012) ("When a party files an opposition addressing only certain arguments raised in a dispositive motion, a court may treat those arguments that the non-moving party failed to address as conceded."); *Day v. D.C. Dep't of Consumer & Regulatory Affairs*, 191 F. Supp. 2d 154, 159 (D.D.C. 2002) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded.").

## **CONCLUSION**

For the reasons set forth above, the Court concludes that the Secretary's Motion for Summary Judgment must be GRANTED and the Providers' Motion for Summary Judgment must be DENIED.  An Order accompanies this Memorandum Opinion.


Date:  November 9, 2012

                                                 _____
                                                 ROBERT L. WILKINS
                                                 United States District Judge